**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**RODNEY PERRY,**

       **Plaintiff,**

**v.**                              **Case No.: 3:10-cv-01248**

**MICHAEL J. ASTRUE,
Commissioner of the Social
Security Administration,**

       **Defendant.**

**<u>MEMORANDUM OPINION</u>**

     This is an action seeking review of the decision of the Commissioner of Social Security (hereinafter the "Commissioner") denying Claimant's application for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f.[1] (Docket No. 2). The case is presently pending before the Court on the parties' cross motions for judgment on the pleadings as articulated in their briefs. (Docket Nos. 12 and 13). Both parties have consented in writing to a decision by the United States Magistrate Judge. (Docket Nos. 7 and 8).

     The Court has fully considered the evidence and the arguments of counsel.  For the reasons set forth below, the Court finds that the decision of the Commissioner is supported by substantial evidence and should be affirmed.

---

[1] Plaintiff's brief references only DIB. (Pl. Br. at 1). However, the record indicates that Plaintiff filed applications for SSI and DIB that were previously addressed by the Social Security Administration.

## I.   <u>Procedural History</u>

On May 1, 2007, Plaintiff, Rodney Perry (hereinafter "Claimant") filed the present Title II application for a period of disability and disability insurance benefits and a Title XVI application for supplemental security income (hereinafter "SSI").[2] (Tr. at 95–106). Both applications alleged a disability onset date of September 21, 1998. The Social Security Administration (hereinafter "SSA") denied both claims on June 15, 2007, and, upon reconsideration, on August 7, 2007. (Tr. at 54–63). Claimant filed a written request for an administrative hearing on August 14, 2007. (Tr. at 67–68). Claimant's request was granted and a hearing by video conference was held on November 14, 2007. (Tr. at 18–40). The Honorable Harry C. Taylor, II, Administrative Law Judge (hereinafter "ALJ") presided over the hearing from Charleston, West Virginia. Claimant, with counsel, appeared at the hearing by video from Huntington, West Virginia. The ALJ denied Claimant's claims by notice and opinion dated February 7, 2008. (Tr. at 5–17). On February 27, 2008, Claimant petitioned the Appeals Council for a review of the ALJ's decision. (Tr. at 4). The ALJ's decision became the final decision of the Commissioner on August 28, 2010 when the Appeals Council denied Claimant's petition. (Tr. at  1–3). Claimant timely filed the present civil action seeking judicial review of the administrative decision pursuant to 42 U.S.C. §405(g). (Docket No. 2). The Commissioner filed an Answer and a Transcript of the Administrative Proceedings, and both parties filed their Briefs in Support of Judgment on the Pleadings. (Docket Nos. 9–12). Consequently, the matter is ripe for resolution.

---

[2] Claimant previously filed an application for DIB on March 15, 2001 alleging a disability onset date of September 21, 1998. The SSA denied Claimant's application on April 5, 2001 and on reconsideration on August 24, 2001.  Claimant requested an administrative hearing. The request was granted and the Administrative Law Judge denied Claimant's DIB application on March 7, 2002. Claimant subsequently requested Appeals Council review on March 18, 2002. On April 17, 2002, the Appeals Council denied Claimant's request. Claimant did not challenge the Appeals Council's decision.

## II.   <u>Summary of ALJ's Decision</u>

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. See *Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. 423(d)(1)(A).

The Social Security Regulations establish a five step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520, 416.920. The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. *Id.* §§ 404.1520(d), 416.920(d). If the impairment does, then the claimant is found disabled and awarded benefits.

However, if the impairment does not, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the next step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case

of disability, and the burden shifts to the Commissioner to prove, as the final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. *Id.* §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger,* 538 F.2d. 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review." 20 C.F.R. §§ 404.1520a, 416.920a. First, the SSA evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. If such impairment exists, the SSA documents its findings. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. §§ 404.1520a(c), 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines the severity of the limitation. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1520a(d)(1), 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the SSA compares the medical findings about

the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. 20 C.F.R. § 404.1520a(d)(2), 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual function. 20 C.F.R. §§ 404.1520a(d)(3), 416.920a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(2), 416.920a(e)(2).

Here, the ALJ determined at the first step of the sequential evaluation that Claimant had not engaged in substantial gainful activity since September 21, 1998, the alleged disability onset date. (Tr. at 10, Finding No. 2). The ALJ acknowledged that Claimant had worked since the alleged onset date, but found that Claimant's efforts at work activity were short-lived and, therefore, constituted unsuccessful work attempts. (*Id.*). Turning to the second step of the evaluation, the ALJ determined that Claimant had the following severe impairments: degenerative disc disease of the lumbar spine, obesity and sensorineural hearing loss (20 CFR 404.1520 (c)). (Tr. at 11, Finding No. 3). The ALJ further concluded that Claimant's peritonsillar abscess,[3] fractured thumb, history of kidney stones, and history of leg burns were nonsevere impairments. (*Id.*). Under the third inquiry, the ALJ determined that Claimant did not have an impairment

---

[3] A collection of infected material around the tonsils.  www.nih.gov.

or combination of impairments that met or medically equaled any of the impairments detailed in the Listing. (Tr. at 12, Finding No. 4). Accordingly, the ALJ assessed Claimant's RFC, finding that Claimant had the residual functional capacity to perform sedentary work with certain postural and environmental limitations. (Tr. at 12–13, Finding No. 5). The ALJ described Claimant's limitations as follows:

> [Claimant] can occasionally climb, balance, stoop, kneel, crouch or crawl. Also, he must avoid concentrated exposure to extreme heat, extreme cold, vibration, respiratory irritants and hazards, such as machinery and heights.

(*Id.*).

The ALJ then analyzed Claimant's past work experience, age, and education in combination with his RFC to determine his ability to engage in substantial gainful activity. (Tr. at 22–24, Finding Nos. 6–10). The ALJ considered that (1) Claimant was unable to perform any past relevant work; (2) he was born in 1962, and at age 36, was defined as a younger individual age 17–44 at the time of the alleged disability onset date (20 CFR 416.963); (3) he had a limited education and could communicate in English; and (4) transferability of job skills was not an issue because Claimant's past relevant work was unskilled. (Tr. at 15–16, Finding Nos. 6–9). Using the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2 as a framework and considering the opinion of a vocational expert, the ALJ found that Claimant could make a successful adjustment to employment positions that existed in significant numbers in the national economy. (Tr. at 15–16, Finding No. 10). At the sedentary level, the ALJ found that Claimant could work as a surveillance system monitor, hand packer, and dispatcher. (*Id.*) Therefore, the ALJ concluded that Claimant was not disabled and, thus, was not entitled to benefits. (Tr. at 16, Finding No. 11).

### III.   Scope of Review

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. In *Blalock v. Richardson*, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock v. Richardson*, 483 F.2d 773, 776 (4th Cir. 1972) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). This Court is not charged with conducting a *de novo* review of the evidence.  Instead, the Court's function is to scrutinize the totality of the record and determine whether substantial evidence exists to support the conclusion of the Commissioner. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The decision for the Court to make is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart*, 434 F. 3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 2001)). If substantial evidence exists, then the Court must affirm the decision of the Commissioner "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775. A careful review of the record reveals that the decision of the Commissioner is based upon an accurate application of the law and is supported by substantial evidence.

### IV.   Claimant's Background

Claimant was 36 years old at the time of the alleged disability onset date, 43 years old at the time he was last insured for Title II benefits, and 46 years old at the time of his administrative hearing. Claimant had previous experience working as a glass plant

laborer. (Tr. at 15). Claimant had limited education and was proficient in English. (*Id.*).

## V.   **Relevant Evidence**

The undersigned has reviewed the Transcript of Proceedings in its entirety, including the medical records in evidence, and summarizes below Claimant's medical treatment and evaluations to the extent that they are relevant to the issues in dispute.

### A.   **Treatment Records**

Progress notes from an unknown treating source indicate that Claimant suffered from pain in his lower back and groin area as early as July 27, 1992 when he suffered an injury at work. (Tr. at 246). On July 31, 1992, Claimant asked for a release so that he could return to work. (*Id.*). Claimant next returned for treatment on February 26, 1996 with complaints of back pain. (*Id.*). Claimant took off work on February 27, 1996 due to his back pain and was prescribed Vicodin and Lodine[4] for the pain. (*Id.*).

On January 20, 1998, Claimant completed a Worker's Compensation form, indicating he injured his back and groin at work on January 13, 1998. (Tr. at 561). On January 20, 1998, Claimant was evaluated at Huntington Urological Association, Inc. by William E. Bloch, MD. Claimant stated that he felt as though he pulled his groin at work and was experiencing pain in his scrotum. (Tr. at 252). Claimant also complained of a history of chronic lower back pain. (*Id.*). Dr. Bloch noted that Claimant was taking hydrocodone to alleviate his pain. (*Id.*). Claimant was diagnosed with epididymitis[5] with prostatitis.

---

[4] Lodine is used to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis and rheumatoid arthritis (arthritis caused by swelling of the lining of the joints). www.nih.gov.

[5] Epididymitis is swelling (inflammation) of the epididymis, the tube that connects the testicle with the vas deferens. Prostatitis is the swelling of the prostate. www.nih.gov.

On September 21, 1998, Claimant was examined by John M. Iaquinto, MD, at Scott Orthopedic Center for complaints of back and groin pain. (Tr. at 248–49). Claimant stated that he was at work at Blenko Glass Company when he felt a pop in his back and immediately started to experience pain in his lower back. (Tr. at 248). Shortly after the injury, Claimant explained that he began to experience scrotal pain. Claimant stated that he experienced pain whenever he squatted down, stood up, or sat for long periods of time. (*Id.*). Further, Claimant noted that he slept on a regular mattress and was unable to sleep on his stomach. (*Id.*). Dr. Iaquinto found that x-rays of Claimant's lumbar spine showed normal spinal architecture in alignment with well-maintained disc spaces. (*Id.*). Dr. Iaquinto noted that Claimant could not touch the floor with straight knees but that tension signs were negative other than moderate hamstring tightness. (Tr. at 249). Claimant was diagnosed with chronic lumbosacral pain with hamstring tightness. (*Id.*). Dr. Iaquinto recommended that Claimant continue to work and begin supervised physical therapy. (Tr. at 249, 560).

Claimant returned to Scott Orthopedic three weeks later on October 12, 1998. Dr. Iaquinto noted that Claimant's tightness in his hamstrings had improved. (Tr. at 563). Claimant was able to bend forward and touch his fingertips to the floor and bend back and look up at the ceiling. (*Id.*). Nevertheless, Claimant stated that his pain was increasing, particularly in his scrotum. (*Id.*). Dr. Iaquinto explained that it was not unusual for the pain to persist and that Claimant should continue physical therapy and his work activities. (*Id.*). A month later on November 27, 1998, Dr. Iaquinto completed an Attending Physician's Report for Claimant's Worker's Compensation claim.  (Tr. at 562). Dr. Iaquinto diagnosed Claimant with a lumbar pain and described his treatment plan for Claimant as "conservative." (*Id.*). Dr. Iaquinto also referred Claimant to Dr.

Bloch to evaluate Claimant's groin pain. (*Id.*). Ultimately, Dr. Iaquinto concluded that Claimant was temporarily and totally disabled. (*Id.*).

On December 8, 1998, Claimant returned to Huntington Urological Association for treatment concerning his persistent groin pain. (Tr. at 568). Dr. Bloch noted that Claimant had been waking up at night with pain in his testicles. (*Id.*). Dr. Bloch instructed Claimant to continue seeing Dr. Iaquinto and confirmed his earlier diagnosis of epidiymitis. (*Id.*). Claimant was prescribed Cipro,[6] Indocin,[7] and Lortab[8] to alleviate his symptoms. (*Id.*). Claimant returned to Scott Orthopedic Center on December 21, 1998 for a follow up appointment with Dr. Iaquinto. (Tr. at 567). He reported that his pain was a ten on a scale of 0-10 prior to taking Cipro but that the Cipro reduced his pain to a seven. (*Id.*). Dr. Iaquinto noted that if Claimant's pain symptoms did not improve by the New Year that he should be re-evaluated by Dr. Bloch. (*Id.*). Further, Dr. Iaquinto recommended that Claimant remain off of work until January 11, 1999, when his job was scheduled to resume after a holiday break. (*Id.*). Following this examination, Dr. Iaquinto submitted another Attending Physician's Report to the Workers' Compensation state agency. (Tr. at 566). In that report, Dr. Iaquinto noted that he diagnosed Claimant with a lumbar sprain and that he was implementing a conservative treatment plan, including re-evaluation by Dr. Bloch. (*Id.*). No rehabilitation services were recommended and January 11, 1999 was set as the date for Claimant's trial return to work. (*Id.*).

---

[6] Ciprofloxacin is used to treat or prevent certain infections caused by bacteria. www.nih.gov.

[7] Indocin is used to relieve moderate to severe pain, tenderness, swelling, and stiffness. www.nih.gov.

[8] Lortab is a narcotic analgesic agent under the hydrocodone class used to treat moderate and severe pain. www.nih.gov.

On January 7, 1999, Dr. Bloch re-evaluated Claimant at Huntington Urological Association. (Tr. at 251). Dr. Bloch noted that Claimant's pain had "eased up somewhat" but that Claimant still experienced intermittent uncomfortable feeling in the testicles. (*Id.*). Claimant was diagnosed as suffering from left orchalgia or epididymitis and instructed to continue to take Cipro. (*Id.*). Dr. Bloch referred him to a pain clinic to see if they could perform a nerve block. (*Id.*). Following his re-evaluation of Claimant, Dr. Bloch sent an update letter to the Workers' Compensation agency, seeking authorization for Claimant's treatment at the pain clinic at St. Mary's Hospital. (Tr. at 573).

On February 11, 1999, Claimant visited the Center for Pain Relief at St. Mary's Medical Center for a consultation and evaluation with Felix Muniz, MD. (Tr. at 407–20). Claimant's chief complaints were bilateral leg pain, bilateral scrotal pain, and lower back pain. (Tr. at 407). Claimant stated that his pain had gotten progressively worse over the year since his back was injured and that it was a constant seven to eight on the numerical pain rating scale. (*Id.*). Claimant stated that standing exacerbated the pain but did not note any other postural limitations. (Tr. at 408). Analgesics were found to decrease Claimant's pain levels. (*Id.*). Dr. Muniz noted that Claimant had a good energy level, good appetite, and did not complain of depression. (*Id.*). While Claimant was previously able to sleep eight hours at a time, he stated that he was only able to sleep for five to six hours a night and would awake in the middle of the night because of pain in his back and scrotal area. (*Id.*). Dr. Muniz found no symptoms of lumbar hyperlordosis but observed some vertebral tenderness. (Tr. at 415). Claimant experienced pain when attempting to bend forwards or backwards, but otherwise had no range of motion limitations. (Tr. at 415–16). Claimant was diagnosed with a lumbar sprain or strain. (Tr. at 418). In his patient history, Claimant indicated that his pain was constant when lying

- 11 -

down, sitting, driving, bending, standing, walking, and changing positions. (Tr. at 419). Dr. Muniz completed an Attending Physician Report for the Workers' Compensation agency in which he noted Claimant suffered from a lumbar sprain. (Tr. at 574). In his report, Dr. Muniz concluded that Claimant was temporarily disabled and proposed June 29, 1999 as the trial return to work date for Claimant. (Tr. at 578).

On March 18, 1999, a MRI of Claimant's lumbar spine was performed at Tri State MRI. (*Id.*). Hans Dransfeld, MD, reviewed the results of the MRI and concluded that the MRI evidenced dessication of the L5-S1 intervertebral disc with a moderate sized disc bulge at the L5-S1 level. (Tr. at 237). No stenosis of the spinal canal was evident and no focal lumbar disc herniation was identified. (*Id.*).

From March to October of 1999, Claimant underwent a series of fluoroscopies[9] of his lumbar spine to ensure the proper placement of hypogastric nerve blocks. (Tr. at 509–24). Dr. Muniz performed the fluoroscopies and concluded that they confirmed his earlier diagnosis that Claimant suffered from bilateral orchialgia. (*Id.*). On May 11, 1999, Dr. Muniz sought permission to prescribe Tylenol #2 to relieve Claimant's persistent pain. (Tr. at 580). On June 19, 1999, Dr. Muniz requested authorization for four more hypograstric nerve blocks. (Tr. at 581).

On July 13, 1999, Claimant was examined at Huntington Urological Association. (Tr. at 582). Dr. Bloch noted that the spinal blocks were helping as Claimant no longer was experiencing chronic pain. (*Id.*). However, Claimant did complain of intermittent pain. (*Id.*). Dr. Bloch recommended that Claimant continue treatment with St. Mary's Pain Clinic. (*Id.*).

---

[9] The dates of Claimant's fluoroscopies and accompanying operation reports were: March 29, 1999; April 19, 1999; May 3, 1999; May 21, 1999, June 11, 1999; August 23, 1999; September 28, 1999; and October 15, 1999.

On October 28, 1999, Paula Reale, M.Ed., and Kathryn Davis, an employee of Blenko Glass, completed an on-site job analysis of Claimant's position for Vocational Rehab Services, Inc. (Tr. at 553–55). The results of the analysis indicated that Claimant's job required him to stand, walk, and sit in equal parts. (Tr. at 553). The job required Claimant to stoop, bend, or squat on a "minimal basis" to perform his job duties. (*Id.*). Further, the job required Claimant to lift and carry less than 25 pounds occasionally to perform job duties. (Tr. at 554). The evaluators concluded that Claimant's job could not be modified temporarily or permanently but that additional light duty positions might be available in other departments. (Tr. at 555).

On November 15, 1999, Claimant returned to the Center for Pain Relief for treatment of lower back and groin pain. (Tr. at 465–66). Claimant stated that each nerve block seemed to last for one to two weeks and then wear off. (Tr. at 465). Claimant further claimed that Tylenol #3 did not help alleviate the pain and that he continued to have problems sleeping. (*Id.*). Dr. Muniz diagnosed Claimant as continuing to suffer from chronic lower back pain and lumbar degenerative disc disease with bilateral groin pain. (Tr. at 467).

On December 21, 1999, Claimant was admitted to Columbia Putnam General Hospital for complaints of a sore throat, difficulty breathing and swallowing, being unable to open his mouth, and severe pain. (Tr. at 232-33). Salvador Portugal, MD, diagnosed Claimant with a right peritonscillar abscess. (Tr. at 232). Dr. Portugal drained the abscess and started Claimant on IV antibiotics. (Tr. at 231). Upon discharge, Claimant was prescribed Augmentin[10] and Lortab to alleviate pain. (Tr. at 229).

---

[10] Augmentin is used to prevent bacterial infections. www.nih.gov.

On February 28, 2000, Linda Reichenbecher, MS, PT, at HPT Physical Therapy Specialists completed a functional capacity evaluation of Claimant at the request of Dr. Muniz. (Tr. at 545–552). After completing her evaluation, Ms. Reichenbecher concluded that Claimant had moderate range of motion deficits in his lumbar spine. (Tr. at 545). Based on her findings concerning Claimant's motion restrictions and functional limitations, Ms. Reichenbecher found that Claimant could perform sedentary work. (*Id.*). Ms. Reichenbecher further emphasized that she believed that Claimant had not given physical therapy sufficient opportunity to work and recommended that he enter a six week program of physical therapy. (Tr. at 546).

On February 29, 2000, Claimant returned to St. Mary's Center for Pain Relief for an appointment with Dr. Muniz to receive his first epidural steroid injection. (Tr. at 463–44). Claimant complained of intense pain in his lower back and groin area and stated that a couple weeks prior to his appointment, the pain was so severe that he was unable to walk. (Tr. at 463). Claimant received his second epidural steroid injection on March 17, 2000, (Tr. at 462.), and a third injection on March 31, 2000. (Tr. at 556). On April 27, 2000, Claimant returned for a follow up appointment with Dr. Muniz. (Tr. at 455). Claimant stated that his back pain had decreased after the steroid injections, but he had reinjured it working on his furnace the previous night. (*Id.*). Claimant rated his pain as an eight or nine out ten on a numerical scale. (*Id.*). Dr. Muniz explained to Claimant that he wanted to start Claimant on Vioxx.[11] Further, Dr. Muniz instructed Claimant to take Lortab sparingly. (*Id.*). Dr. Muniz requested a functional capacity evaluation for Claimant and expressed support for starting Claimant on a work hardening program. (*Id.*).

---

[11] Vioxx was used as an anti-inflammatory to relieve pain and tenderness. www.nih.gov.

On June 14, 2000, Claimant returned for treatment on his lower back and groin pain with Dr. Muniz. (Tr. at 452–54). Claimant continued to take Lortab two to three times per day.  He reported that he could not get authorization for Vioxx. (Tr. at 452). Dr. Muniz noted that Claimant continued to sleep poorly. (*Id.*). Dr. Muniz summarized the Functional Capacity Evaluation conducted at Generations Physical Therapy (GPT) on June 8th and 9th, stating: "[Claimant] is capable of performing at the sedentary physical demand characteristics level as defined by the U.S. Department of Labor. . . . However, . . . [Claimant's] test results should be considered invalid and unreliable, representing submaximal effort." (Tr. at 452). GPT further concluded that the potential for significant improvement with a work hardening program was poor. (*Id.*). Dr. Muniz asked Claimant if he was able to go back to work at his previous job, even on a trial basis, and Claimant replied that he was unable to do that. (*Id.*). Consequently, Dr. Muniz recommended that Claimant begin looking for other jobs. (*Id.*). If Claimant was unable to find a job appropriate for him, Dr. Muniz recommended that he be placed in vocational rehabilitation. (*Id.*).

Claimant returned for treatment of his lower back and groin pain with Dr. Muniz on July 19, 2000. (Tr. at 451). Claimant stated that he had not been taking Lortab every day, but when the pain was severe, even Lortab was not helping. (*Id.*). Claimant also noted that the pain was consistently interrupting his sleep. (*Id.*). Dr. Muniz reiterated his belief that Claimant could return to work. (*Id.*). Claimant's complaints were the same when he returned to Dr. Muniz's office on September 20, 2000. (Tr. at 448–50). Dr. Muniz increased Claimant's dosage of Lortab and encouraged Claimant to attend his scheduled neurosurgical evaluation with Jerry Day, MD. (Tr. at 449). Dr. Muniz emphasized that if Claimant had no surgical options, he would need continuing

vocational rehabilitation and medication to keep his pain under control and facilitate his return to work. (*Id.*).

On October 23, 2000, Claimant was evaluated at Tri State Neuroscience Center by Dr. Day for treatment options regarding his back pain. (Tr. at 540–42). On November 7, 2000, Dr. Day reviewed a MRI of Claimant's lumbar spine and found that Claimant had a minor bulge at L5-S1, mild disc space degeneration at L5-S1, and otherwise healthy discs with normal spinal alignment. (Tr. at 543–44). Dr. Day concluded that Claimant was limited in his exertional capability because of pain and that Claimant would be unable to return to his prior occupation. (Tr. at 544). Dr. Day further noted that Claimant would have a lasting disability and no surgical option was available to him. (*Id.*). Therefore, Dr. Day found that Claimant would need long term narcotic medication and to pursue vocational rehabilitation directed towards a field or position with a sedentary work classification. (*Id.*).

Following his visit to Dr. Day, Claimant returned to treatment with Dr. Muniz on December 6, 2000. (Tr. at 444–47). Dr. Muniz reviewed Dr. Day's letter with Claimant and explained to Claimant that he had reached maximum medical improvement. (Tr. at 444). Therefore, Dr. Muniz recommended that Claimant be formally entered into a vocational rehabilitation program. (*Id.*). Claimant returned to the Center for Pain Relief for a follow up appointment with Dr. Muniz on February 21, 2001. (Tr. at 441–43). Claimant's complaints were consistent with previous complaints of groin and back pain. (Tr. at 441). Claimant emphasized that the pain was more severe than in the past and rated his pain as a nine out of ten. (*Id.*). Dr. Muniz noted that Claimant took Lortab twice a day, but that it provided little relief for Claimant's pain symptoms. (*Id.*). Explaining that he believed Claimant would have to learn to live with some of the pain,

Dr. Muniz offered to try and help with new medications and re-emphasized his belief that Claimant needed to be enrolled in a vocational rehabilitation program. (*Id.*). Dr. Muniz discontinued Claimant's Lortab and started Claimant on a trial of Duragesic.[12]

On March 13, 2001, Dr. Muniz met with Gene Teams from Vocational Rehabilitation Services (VRS) regarding Claimant's prospects for re-entering the work force. (Tr. at 439–40). Mr. Teams informed Dr. Muniz that VRS recognized that Claimant had reached maximum medical improvement and was capable of sedentary to light work. (Tr. at 439). Claimant's employer had seven positions available in the category of sedentary to light work, including repairing lamps and operating a mechanical lifter. (*Id.*). Although these jobs paid less, the company agreed to keep Claimant on at his higher previous salary. (*Id.*). Dr. Muniz stated that he thought this was a "great opportunity" for Claimant and released him to go back to work in a sedentary to light duty position. (*Id.*).

On March 25, 2001, Claimant was treated at St. Mary's Medical Center for complaints of pain in wrist and thumb that resulted from physically striking another person. (Tr. at 507–08). An x-ray of Claimant's left wrist and thumb revealed a fracture at the base of the thumb at the metacarpal area. (507–08). Hospital staff placed a splint on Claimant's thumb and prescribed Lortab to alleviate Claimant's pain symptoms. (Tr. at 507).

On April 11, 2001, Claimant returned to the Center for Pain Relief for treatment of his lower back and groin pain. (Tr. at 437–38). Claimant rated his pain level as an eight out of ten. (Tr. at 437). Dr. Muniz noted that Claimant continued to use Duragesic

---

[12] Duragesic is used to relieve moderate to severe pain that is expected to last for some time, that does not go away, and that cannot be treated with other pain medications. www.nih.gov.

patches and Vioxx for his pain symptoms. (*Id.*). Claimant reported that that these medications were moderately helpful. (*Id.*). When Dr. Muniz inquired regarding Claimant's return to work, Claimant indicated that he was unaware that he had been released to return to work. (*Id.*). Dr. Muniz noted that as a result of Claimant's fractured thumb, Claimant would not be able to begin to work until his cast was off. (*Id.*). Claimant followed up with Dr. Muniz two months later on June 13, 2001. (Tr. at 434–36). At this time, Claimant's cast had been removed and he was ready to return to work at a sedentary to light duty position. (Tr. at 434). Dr. Muniz did not see Claimant again until September 19, 2001 when Claimant returned for treatment of his lower back pain. (Tr. at 430–33). Claimant rated his pain as a nine out of ten and noted that his medication was not providing much relief from his pain. (Tr. at 430). Claimant further stated that he was only sleeping about two hours per night because of the pain and, consequently, was very tired at work. (*Id.*). By this time, Claimant was working full time. (*Id.*). Dr. Muniz increased Claimant's dosage of Duragesic and started Claimant on Vistaril to help him sleep at night. (*Id.*). Claimant was diagnosed as suffering from chronic lumbar pain and lumbar degenerative disc disease. (*Id.*). Dr. Muniz instructed Claimant to continue working full time. (*Id.*).

On November 20, 2001, Claimant returned to the Center for Pain Relief for treatment with Dr. Muniz. (Tr. at 426). Claimant complained of lower back pain, bilateral leg pain, and constipation, which he believed was a side effect of the Duragesic patches. (*Id.*). Dr. Muniz noted that Claimant's insomnia was still a problem and that the Vistaril did not seem to be helping. (*Id.*). Claimant did not feel the Vioxx was helping much either. (*Id.*). Ultimately, Dr. Muniz concluded that Claimant "does not realize that he is functioning fairly well and able to continue working full time." (Tr. 426). On

February 20, 2002, Dr. Muniz again treated Claimant for his lower back pain, bilateral leg pain, and groin pain. (Tr. at 424–25). Claimant complained of continued lower back pain and bilateral leg pain, rating his pain as an eight out of ten. (Tr. at 424). Claimant stated that he continued to work full time but that he would be laid off soon because of a lack of demand. (*Id.*). Claimant estimated that he would be laid off for two to four months until tourist season began and demand increased. (*Id.*). Claimant resumed taking Lortab, instead of Duragesic patches, because of "personality changes and irritability." (*Id.*). Dr. Muniz found that Claimant's post lumbar strain had not grossly deteriorated from the original baseline findings. (*Id.*).

Charles Abraham, MD, examined Claimant on April 23, 2002 for complaints of hearing loss and tinnitus. (Tr. at 242–43). Claimant reported having difficulty hearing his television and in group situations which had increased over the past several years. (*Id.*). Dr. Abraham described the results of an ENT ear exam as "unremarkable" and diagnosed Claimant with sensorineural hearing loss. (*Id.*). Dr. Abraham concluded that Claimant had suffered .55% loss of function for "noise induced hearing loss." (*Id.*).

On May 22, 2002, Claimant returned to the Center for Pain Relief for a follow up appointment with Dr. Muniz. (Tr. at 405–06). Claimant stated that his pain was constant even with medication and rated it as an eight out of ten. (Tr. at 405). Dr. Muniz noted complaints of pain radiating mostly down his left leg. (*Id.*). Claimant attempted to control the pain with the use of Lortab, hot baths, and tanning beds. (*Id.*). Dr. Muniz found that Claimant had an allowable Workers' Compensation diagnosis, discontinued Claimant's use of Lortab, and prescribed methadone[13] to treat Claimant's pain

---

[13] Methadone is used to relieve moderate to severe pain that has not been relieved by non-narcotic pain relievers.

symptoms. (*Id.*). Dr. Muniz requested a repeat MRI to rule out disc herniation. (*Id.*). The MRI was performed on June 10, 2002 at Tri State MRI and showed a normal spine with the exception of decreased signal intensity and mild central and bilateral bulging at L5-S1. (Tr. at 238). The remaining disc spaces were unremarkable with no evidence of herniated discs or significant spinal stenosis. (*Id.*). On August 1, 2002, Claimant returned to Dr. Muniz for follow-up on the MRI results. (Tr. at 401–03). Claimant stated that the Methadone helped alleviate pain but caused him to stay awake at night. (Tr. at 401). Claimant provided a letter to Dr. Muniz from his employer stating that he had been laid off as they did not have the need for sedentary-light duty workers. (*Id.*). Dr. Muniz requested a functional capacity evaluation and suggested that Claimant begin a work hardening program. (*Id.*). After reviewing Claimant's MRI, Dr. Muniz noted that it showed no significant changes from the prior MRI in 1999 and reflected only mild degenerative changes. (*Id.*). On September 12, 2002, Claimant returned to Dr. Abraham's office for a follow up appointment regarding his hearing loss. (Tr. at 240–41). Dr. Abraham noted that Claimant was not experiencing dizziness or suffering from any ear pain, but that he complained of constant bilateral tinnitus. (Tr. at 240).

On January 28, 2003, Claimant was examined by Steven Nelson, Physician Assistant, Certified, under the supervision of David Caraway, MD, at the Center for Pain Relief. (Tr. at 398–400). Claimant complained of lower back and groin pain, noting that over the previous three months the pain had started to radiate and was becoming progressively worse. (Tr. at 398). Claimant was prescribed Neurontin[14] and Vioxx in addition to his continuing prescription for Lortab. (Tr. at 399). Mr. Nelson diagnosed Claimant as suffering from an unspecified sacroiliac strain and lumbar radiculopathy.

---

[14] Neurontin is used as a pain reliever for moderate to severe pain. www.nih.gov.

(Tr. 398). On March 12, 2003, Claimant returned to the Center for Pain Relief for an appointment with Mr. Nelson. (Tr. at 395–97). Claimant stated that the pain in his legs was increasing with alternating burning and numbness sensations. (Tr. at 395). Mr. Nelson noted that Claimant requested to have his Lortab prescription rewritten. (*Id.*). Mr. Nelson also discussed starting Claimant on anti-depressants and requesting authorization from Workers' Compensation for another series of epidural steroid injections. (Tr. at 396). Claimant began a series of epidural steroid injections under fluoroscopy on April 22, 2003.[15] (Tr. at 493–506).

On April 30, 2003, Dr. Caraway of the Center for Pain Relief completed a Workers' Compensation Controlled Substance form regarding Claimant's medical treatment. (Tr. at 472). Dr. Caraway noted that Claimant's pain was chronic and concentrated in his lower back. (*Id.*). Psychological factors were not found to be relevant to Claimant's treatment. (*Id.*). Dr. Caraway found that opioids and injections improved Claimant's condition. (*Id.*). Claimant was again examined by Dr. Caraway on July 16, 2003 for complaints of lower back. (Tr. at 392–94). Although Claimant had re-injured his back, Claimant stated that the epidural steroid injections had provided him with "the best relief ever." (Tr. at 392). Dr. Caraway informed Claimant that there was little that he could do and that Claimant had reached maximum medical improvement. (*Id.*). Dr. Caraway recommended that Workers' Compensation provide Claimant with vocational rehabilitation. (*Id.*). Subsequently, on August 19, 2003, Claimant was treated by an unknown source for burns on his leg. (Tr. at 244). The treating source prescribed an antibiotic, Keflex, to treat the burns. (*Id.*). On September 17, 2003, Claimant returned to

---

[15] Claimant received additional injections on May 20, 2003; June 10, 2003; April 27, 2004; June 1, 2004; and June 14, 2005

the Center for Pain Relief for an appointment with Dr. Caraway. (Tr. at 389–91). Claimant stated that he was in severe pain and that his Lortab prescription had been denied by Workers' Compensation. (Tr. at 389). Claimant stated that Vioxx and Neurontin helped to a limited extent and that he continued to sleep poorly because of the pain. (*Id.*). Dr. Caraway reviewed Claimant's MRI from the previous year and concluded that there was nothing medically significant in the MRI. (*Id.*). Claimant returned to Dr. Caraway's office for treatment two months later on November 12, 2003. (Tr. at 387–88). Claimant complained of lower back pain and leg pain, which had increased over the previous two months as Workers' Compensation denied his authorization for use of Neurontin, Vioxx, and Lortab. (Tr. at 387). Dr. Caraway noted that Claimant's MRI was "unimpressive" and that a physical examination of Claimant revealed no significant motor or sensory deficits. (*Id.*). Further, Dr. Caraway concluded that Claimant had a good range of motion of the cervical and lumbar spine and all of his extremities. (*Id.*). Claimant was found to be at maximum medical improvement. (*Id.*). Dr. Caraway submitted a Medical Statement to the Workers' Compensation agency, stating that he believed Claimant should be authorized to undergo vocational rehabilitation as he was physically unable to return to his previous occupation. (Tr. at 474).

On February 11, 2004, Claimant returned to Dr. Caraway's office for an appointment regarding treatment of his lower back pain. (Tr. at 385–86). Dr. Caraway noted that Claimant's physical condition remained the same and that Claimant was having a variety of psychosocial and financial issues. (Tr. at 385). Claimant requested an increase in Lortab and another round of steroid injections; Dr. Caraway noted that he would consider one or two injections to determine if this provided a significant

reduction in pain. (*Id.*). Again, Dr. Caraway emphasized that Claimant's MRI was unimpressive, stating "all [Claimant] has is a bulging disc without any significant spinal stenosis. Certainly, this is not of the surgical variety." (*Id.*). Dr. Caraway then had a "frank discussion" with Claimant regarding Claimant's use of opioids. (*Id.*). Claimant denied any diversion or abuse of the medication and explained that they helped significantly in alleviating his pain. (*Id.*). Claimant subsequently received two epidural steroid injections on July 22, 2004, which Claimant described as helping considerably with his leg pain. Claimant remarked that he was able to perform some yard and house work following the two injections he received. (Tr. at 383–84). Claimant added, however, that his lower back pain continued despite the injections. (Tr. at 383). Dr. Caraway noted that Claimant got up slowly from his chair, but was able to stand and squat without assistance. (*Id.*). Concluding that Claimant was at maximum medical improvement, Dr. Caraway decided to begin weaning Claimant off Neurontin and Vioxx since they did not seem to adequately alleviate his pain symptoms. (*Id.*). Dr. Caraway re-evaluated Claimant on September 27, 2004. (Tr. at 380–81). Claimant stated that injections provided him with about three months worth of relief and that the Zanaflex[16] he had been prescribed helped with his range of motion. (Tr. at 380). Dr. Caraway noted that Claimant had a hearing scheduled with Workers' Compensation for October 6, 2004. (*Id.*).

Claimant's pain increased over the winter of 2004-2005. (Tr. at 376–79). Dr. Caraway noted on March 23, 2005 that Claimant appeared to be doing much worse as evidenced by his pain and difficulty getting out of the chair to the exam table. (Tr. at 376). Dr. Caraway again found that Claimant had reached maximum medical

---

[16] Zanaflex is used as a muscle relaxant. www.nih.gov.

improvement. (*Id.*). On July 27, 2005, Claimant again presented to Dr. Caraway with complaints of lower back pain. (Tr. at 374). Claimant stated that the epidural injections had provided him with three weeks relief from pain. (*Id.*). Claimant indicated that he was having financial problems, reporting that his temporary total disability had been discontinued and he had spent all of his retirement money. (*Id.*). Claimant asked Dr. Caraway to fill out a form to re-open his Workers' Compensation claim and to order a repeat MRI. (*Id.*). Upon examination, Dr. Caraway observed that Claimant could move all of his extremities without difficult, had a good range of motion of his cervical and lumbar spine, and had no focal neurological deficits. (*Id.*). Explaining to Claimant that he was at maximum medical improvement, Dr. Caraway informed Claimant that adequate grounds to re-open a Workers' Compensation claim did not exist. (*Id.*). Dr. Caraway further explained that a MRI would not be helpful as there were no surgical options available to Claimant. (Tr. at 374).

On September 28, 2005, Dr. Caraway met with Claimant and explained again that he did not think a MRI would be helpful. (Tr. at 371). However, Dr. Caraway did agree to complete a request to re-open Claimant's Workers' Compensation claim. (Tr. at 371). Other than some symptoms of depression, Dr. Caraway did not find any remarkable changes in Claimant's health status. (*Id.*). On January 4, 2006, Claimant returned for an appointment with Dr. Caraway. (Tr. at 368–69). Dr. Caraway noted that Claimant had begun part-time work at a car wash, but that this work aggravated Claimant's pain significantly. (Tr. at 368). Dr. Caraway reemphasized that Claimant was at maximum medical improvement with no neurological deficits. (*Id.*). Claimant subsequently received one epidural steroid injunction in his lumbar spine on February 17, 2006. (Tr. at 491–492). At Claimant's next visit on March 22, 2006, no changes in

his condition were found and Claimant continued to work part-time at the car wash. (Tr. at 363–64).

Claimant returned again on June 26, 2006 for an appointment at the Center for Pain Relief. (Tr. at 353–54). Andrea Zekan, APRN, examined Claimant and found no change in his medical condition. (Tr. at 354). Claimant indicated that he was no longer working at the car wash and asked Ms. Zekan about the status of his Workers' Compensation claim. He also requested an increase in his Lortab prescription. (*Id.*). Ms. Zekan informed Claimant that he would need to speak with Dr. Caraway about those issues and that she would be scheduling a drug screen for Claimant at his next appointment. (*Id.*). Claimant stated that he had not taken or used any controlled substances. (*Id.*). Ms. Zekan noted that the steroid injections had been very beneficial for Claimant and suggested that he receive another one. (*Id.*). Claimant's drug screen was positive for cannabinoid and opiate (specifically hydrocode and hydromorphone) usage. (Tr. at 359).

On July 13, 2006, Claimant returned to the Center for Pain Relief for a follow up appointment. (Tr. at 347–52). Claimant was examined by Steven Nelson, PA-C, for continuing complaints of back pain. (Tr. at 347). Mr. Nelson discussed the results of Claimant's drug screen and discussed another series of steroid injections. (*Id.*). On November 3, 2006, Claimant was seen at the Center for Pain Relief by Jessica Riddle, PAC, for a follow up appointment. (Tr. at 337–38). Claimant was unable to receive an injection or medications as his authorization from Workers' Compensation had expired out since his last visit. (Tr. at 337.) Accordingly, Ms. Riddle explained to Claimant that if his drug screen that day came back positive for the use of controlled substances they would no longer be able to provide him with narcotics for his pain management. (Tr. at

338). Claimant admitted that he had used marijuana two weeks prior to that day. (Tr. at 337). Ms. Riddle explained that they would continue with a conservative treatment plan for his back injury. (Tr. at 338). Claimant subsequently received a epidural steroid injection on January 16, 2007. (Tr. at 489–90). Claimant returned to the Center for Pain Relief shortly thereafter on January 22, 2007 with complaints of increased radicular pain. (Tr. at 323–26). Claimant stated that the steroid injection had helped with his lower back pain, but that the pain in his groin and legs was severe. (Tr. at 323). Claimant requested that Ms. Riddle prescribe him something stronger, as he was taking more Lortab than prescribed. (*Id.*). Ms. Riddle informed Claimant that she would not refill his Lortab before it was due and would not increase his pain medication. (*Id.*). However, Ms. Riddle noted that she would seek Workers' Compensation to authorize prescriptions for Neurontin, Zanaflex, and Lortab for his pain complaints. (*Id.*).

On February 15, 2007, Claimant presented to the Emergency Room at St. Mary's Medical Center with complaints of pain in his right flank; a CT scan of his abdomen confirmed the diagnosis of a kidney stone. (Tr. 485–88). Claimant returned to the Emergency Room at St. Mary's five days later on February 20, 2007. (Tr. at 476–84). Claimant's pain had increased significantly and the kidney stone had not passed. (Tr. at 478–79). Rocco Morabito, MD, performed a cystoscopy and removed Claimant's kidney stone. (Tr. at 482).

On March 13, 2007, Claimant returned to the Center for Pain Relief for treatment with Ms. Riddle. (Tr. at 304–15). Claimant complained of lower back and bilateral groin pain and emphasized that he was experiencing significant radicular pain. (Tr. at 304). Further, Claimant stated that the steroid injection was not as helpful as they had been in the past. (*Id.*). Claimant again tested positive for the use of hydrocodone,

hydromorphone, and oxycodone. (Tr. at 308). Ms. Riddle documented that Claimant should not have oxycodone in his system and that Claimant's use of that drug would need to be discussed at his next appointment. (Tr. at 312). Claimant's medical condition was the same at his follow up appointment on April 16, 2007. (Tr. at 293–94). Claimant requested another steroid injection; Ms. Riddle agreed that this would be an appropriate course of treatment. (*Id.*). Claimant ultimately received the injection on July 10, 2007. (Tr. at 475).

### B.    Agency Assessments

On June 11, 2007, Fulvio Franyutti, MD, a state agency physician, reviewed the medical evidence of record and completed an RFC assessment of Claimant. (Tr. at 283–90). Dr. Franyutti concluded that Claimant could occasionally lift 20 pounds, frequently lift 10 pounds, stand or walk about six hours a day, sit for six hours a day, and was unlimited in his ability to push or pull. (Tr. at 284). Dr. Franyutti identified numerous postural limitations. Claimant could only occasionally engage in activities that required climbing ramps or stairs, balancing, stooping, or kneeling. (Tr. at 285). Claimant could never engage in activities that required the climbing of ladders, ropes, or scaffolds; crouching; or crawling. (*Id.*). Dr. Franyutti noted no manipulative, communicative, or visual limitations for Claimant, but determined that Claimant was subject to several environmental limitations. (Tr. at 286-87). Dr. Franyutti concluded that Claimant should avoid concentrated exposure to extreme cold; fumes, odors, dusts, gases, and poor ventilation; and hazards such as machinery or heights. (Tr. at 287). Dr. Franyutti referenced Claimant's reports of stabbing and burning pain in his lower back and groin area which was aggravated by moving and prolonged sitting and standing; difficulty lifting anything heavier than five pounds, squatting, bending, standing, sitting, kneeling,

walking, stair climbing, concentrating, hearing, and sleeping; and occasional difficulty putting on pants and socks although he was able to do the laundry and clean his bathroom sink. (Tr. at 290). Dr. Franyutti opined that Claimant was partially credible and that his allegations were only partially supported by the medical record. (Tr. at 288).

On August 2, 2007, Uma Reddy, MD, a state agency physician, reviewed the medical evidence of record and completed an RFC assessment of Claimant. (Tr. at 529–36). Dr. Reddy concluded that Claimant could occasionally lift 50 pounds, frequently lift 25 pounds, stand or walk about six hours a day, sit for six hours a day, and was unlimited in his ability to push or pull. (Tr. at 530). Claimant was limited to occasionally climbing ramps, stairs, ladders, ropes, and scaffolds; balancing; stooping; kneeling; crouching; and crawling. (Tr. at 531). Dr. Reddy noted no manipulative, communicative, or visual limitations for Claimant. (Tr. at 532–33). Claimant was required to avoid concentrated exposure to extreme cold, extreme heat, vibration, and hazards such as machinery and heights. (Tr. at 533). Dr. Reddy opined that Claimant was partially credible and that Claimant's allegations regarding his back pain were only partially supported by the record. (Tr. at 534). Dr. Reddy further noted that she evaluated Claimant's hearing loss and found no significant limitations. (*Id.*).

## VI.   **Claimant's Challenges to the Commissioner's Decision**

Claimant alleges that the Commissioner's decision was not supported by substantial evidence. He argues that the ALJ (1) failed to fully and fairly develop the record, (2) failed to recognize the severity of Claimant's impairments when considered in combination, and (3) gave an improper hypothetical to the vocational expert at Claimant's administrative hearing.  (Pl. Br. at 12–16).

## VII.   <u>Analysis</u>

Having thoroughly considered the evidence and the arguments of counsel, the Court rejects Claimant's contentions as lacking merit. Additionally, the Court finds that the decision of the Commissioner is supported by substantial evidence and should be affirmed.

### A.   <u>Duty to Develop Record</u>

Claimant contends that the ALJ failed to fully develop the record with regard to Claimant's complaints of pain resulting from degenerative disc disease of the lumbar spine and sensorineural hearing loss in the right ear. (Pl. Br. 13–14). Further, Claimant argues that the ALJ failed to fully develop the record regarding Claimant's depression, constituting reversible error under the regulations. (Pl. Br. 14).  These arguments are unpersuasive.

An ALJ has the duty to fully and fairly develop the record, but is not required to act as Claimant's counsel. *Clark v. Shalala,* 28 F.3d 828 (8th Cir. 1994). *See also U.S.— Reed v. Massanari*, 270 F.3d 838 (9th Cir. 2001); *Haley v. Massanari*, 258 F.3d 742 (8th Cir. 2001); *Smith v. Apfel*, 231 F.3d 433 (7th Cir. 2000).  To the contrary, an ALJ has the right to presume that Claimant's counsel presented Claimant's strongest case for benefits. *Nichols v. Astrue,* 2009 WL 2512417 *4 (7th Cir. 2009) (citing *Glenn v. Sec'y of Health and Human Servs.,* 814 F.2d 387, 391 (7th Cir. 1987)). Moreover, an ALJ's duty to develop the record does not mandate that he or she order a consultative examination "as long as the record contain[ed] sufficient evidence for the administrative law judge to make an informed decision." *Ingram v. Commissioner of Social security Administration,* 496 F.3d 1253, 1269 (11th Cir. 2007). *See also*, *Weise v. Astrue,* 2009 WL 3248086 (S.D. W.Va.). Ultimately, "[a]lthough the ALJ has the duty to develop the

record, such a duty does not permit a claimant, through counsel, to rest on the record . . . and later fault the ALJ for not performing a more exhaustive investigation." *Maes v. Astrue*, 522 F.3d 1093, 1097 (10th Cir. 2008). *See also* Social Security Act, § 223(d)(5)(B), 42 U.S.C.A. § 423(d)(5)(B); 20 C.F.R. § 404.1512(d).

"An ALJ's duty to develop the record further is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." *Mayes v. Massanari*, 276 F.3d 453, 459–60 (9th Cir. 2001). When considering the adequacy of the record, the Court must look for evidentiary gaps that result in "unfairness or clear prejudice" to the claimant. *Brown v. Shalala,* 44 F.3d 931, 935 (11th Cir. 1995). A remand is not warranted every time a claimant alleges that the ALJ failed to fully develop the record. *Brown*, 44 F.3d at 935 (finding that remand is appropriate when the absence of available documentation creates the likelihood of unfair prejudice to the claimant.). The decision of an ALJ will not be overturned for failure to fully and fairly develop the record "unless the claimant shows that he or she was prejudiced by the ALJ's failure. To establish prejudice, a claimant must demonstrate that he or she could and would have adduced evidence that might have altered the result." *Carey v. Apfel*, 230 F.3d 131, 142 (5th Cir. 2000).

### i.     Back Pain and Hearing Loss

If there were evidentiary gaps that resulted in unfairness or prejudice to Claimant, the ALJ would have been required to develop the record as to Claimant's pain resulting from degenerative disc disease of the lumbar spine and sensorineural hearing loss in the right ear. However, in this case, the ALJ had detailed records of examinations, assessments, consultations, laboratory and radiological studies that spanned the period from January 1998 through August 2007. These records provided

substantial evidence of the status of Claimant's medical conditions as they existed during the alleged period of disability. Notably, neither Claimant nor his counsel raised any concerns regarding the adequacy of the medical record at the administrative hearing. (Tr. at 18–40). The extensive treatment records from the Center for Pain Relief at St. Mary's Medical Center, various emergency room visits, Workers' Compensation evaluations, and RFC assessments all addressed Claimant's complaints of back and groin pain and provided a chronological history of Claimant's pain symptoms. This extensive documentation created a more than adequate record from which the ALJ could evaluate the persistence and severity of Claimant's complaints of back and groin pain. In addition, the questioning of Claimant by his attorney and the ALJ during the administrative hearing further developed the record as to Claimant's complaints of back and groin pain. (Tr. at 28–31, 33–34). Claimant had ample opportunity to describe the pain that resulted from certain physical activities, his use of pain medications, and his regimen of injections. The ALJ thoroughly reviewed these complaints in his opinion denying Claimant's applications for benefits. (Tr. at 14). To the extent that Claimant's hearing loss was discussed, neither Claimant's treatment records nor his testimony suggested that he suffered from any significant impairment. As such, the Court cannot identify any evidentiary gaps in the medical record or unfair prejudice; consequently, the ALJ's actions were appropriate in this case.

### ii. Depression

Claimant's argument that the ALJ failed to fully develop the record regarding Claimant's depression fails for similar reasons. Claimant had the ultimate responsibility to prove his disability. 20 C.F.R. §404.1512(a) and §416.912(a). *See also Stahl v. Commissionr of Social Security Administration,* 2008 WL 2565895 *4 (N.D. W.Va.)

(citing *Highland v. Apfel*, 149 F,3d 873 (8th Cir. 1998)).  Title 42 U.S.C. § 423(d)(5)(B)

states:

> In making any determination with respect to whether an individual is
> under a disability or continues to be under a disability, the Commissioner
> of Social Security shall consider all evidence available in such individual's
> case record, and shall develop a complete medical history of at least the
> preceding twelve months for any case in which a determination is made
> that the individual is not under a disability. In making any determination
> the Commissioner of Social Security shall make every reasonable effort to
> obtain from the individual's treating physician (or other treating health
> care provider) all medical evidence, including diagnostic tests, necessary
> in order to properly make such determination, prior to evaluating medical
> evidence obtained from any other source on a consultative basis.

However, as the United States Supreme Court noted in *Bowen v. Yuckert*, the :

> severity regulation does not change the settled allocation of burdens of
> proof in disability proceedings . . . the claimant first must bear the burden
> . . . of showing that . . . he has a medically severe impairment or
> combination of impairments. . . . *It is not unreasonable to require the
> claimant, who is in a better position to provide information about his
> own medical condition, to do so.*

482 U.S. 137, 146 (1987) (emphasis added).

Citing Dr. Caraway's "diagnosis" of depression, Claimant argues that the ALJ

failed to develop the record regarding his mental condition. (Pl. Br. 14). Dr. Caraway

provided Claimant with a two-week sample of Lexapro on March 12, 2003. (Tr. 396). At

Claimant's next appointment on July 16, 2003, there was no discussion of his use of

Lexapro, no prescription was signed, and no further diagnosis of depression was noted.

(Tr. at 393). No subsequent mention of depression was made until July 27, 2005 when

Dr. Caraway noted in passing that Claimant exhibited signs of "some depression." (Tr. at

374). The medical records are essentially devoid of documentation substantiating the

ongoing diagnosis and treatment of depression. Claimant's argument that the ALJ failed

to develop the record with respect to his alleged depression requires some factual

foundation upon which to discern a gap in the evidentiary record that would be prejudicial to Claimant. "To establish prejudice, a claimant must demonstrate that he or she could and would have adduced evidence that might have altered the result." *Carey v. Apfel*, 230 F.3d 131, 142 (5th Cir. 2000). Claimant makes no reference to the existence of additional evidence that might have altered the result of the ALJ's decision.[17] Accordingly, the Court has no basis upon which to conclude that the ALJ failed to adequately develop the record and finds Claimant's argument to be without merit.

### B. __Impairments in Combination__

Claimant argues that his impairments when considered in combination "clearly" equal a listed impairment. A determination of disability may be made at step three of the sequential evaluation when a claimant's impairments meet or medically equal an impairment included in the Listing. The purpose of the Listing is to describe "for each of the major body systems, impairments which are considered severe enough to prevent a person from doing any gainful activity." *See* 20 C.F.R. § 404.1525. Because the Listing is designed to identify those individuals whose medical impairments are so severe that they would likely be found disabled regardless of their vocational background, the SSA has intentionally set the medical criteria defining the listed impairments at a higher level of severity than that required to meet the statutory standard of disability. *Sullivan v. Zebley,* 493 U.S. 521, 532 (1990). Inasmuch as the Listing bestows an irrefutable presumption of disability, "[f]or a claimant to show that his impairment matches a [listed impairment], it must meet *all* of the specified medical criteria." *Sullivan*, 493 U.S. at 530.

---

[17] Of note, Claimant did not raise the issue of depression in his applications for SSI or DIB, his request for reconsideration, his request for an administrative hearing, or at the administrative hearing itself.

To establish medical equivalency, a claimant must present evidence that his impairment, unlisted impairment, or combination of impairments, is equal in severity and duration to all of the criteria of a listed impairment. *Id.* at 520; *See also* 20 C.F.R. § 404.1526. In Title 20 C.F.R. § 404.1526, the SSA sets out three ways in which medical equivalency can be determined. First, if the claimant has an impairment that is described in the Listing, but (1) does not exhibit all of the findings specified in the listing, or (2) exhibits all of the findings, but does not meet the severity level outlined for each and every finding, equivalency can be established if the claimant has other findings related to the impairment that are at least of equal medical significance to the required criteria. § 404.1526(b)(1). Second, if the claimant's impairment is not described in the Listing, equivalency can be established by showing that the findings related to the claimant's impairment are at least of equal medical significance to those of a similar listed impairment. § 404.1526(b)(2). Finally, if the claimant has a combination of impairments, no one of which meets a listing, equivalency can be proven by comparing the claimant's findings to the most closely analogous listings; if the findings are of at least equal medical significance to the criteria contained in any one of the listings, then the combination of impairments will be considered equivalent to the most similar listing. *See, e.g.,* § 404.1526(b)(3).

As the Supreme Court clearly explained in *Sullivan*, "[f]or a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments is 'equivalent' to a listed impairment, he must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment . . . A claimant cannot qualify for benefits under the 'equivalency' step by showing that the overall functional impact of his unlisted impairment or combination of impairments is as severe as that of a listed

impairment." *Sullivan*, 493 U.S. at 531.[18] Ultimately, to determine whether a combination of impairments equals the severity criteria of a listed impairment, the signs, symptoms, and laboratory data of the combined impairments must be compared to the severity criteria of the Listing. "The functional consequences of the impairments . . . irrespective of their nature or extent, *cannot* justify a determination of equivalence." *Id.* at 532 (citing SSR 83-19).[19]

Here, the ALJ determined that Claimant had the following severe impairments: degenerative disc disease of the lumbar spine, obesity and sensorineural hearing loss (20 CFR 404.1520 (c)). (Tr. at 11,). The ALJ further concluded that Claimant's peritonsillar abscess, fractured thumb, history of kidney stones, and history of leg burns were non-severe impairments. (*Id.*). Claimant did not explicitly identify any listed impairment that he might satisfy based upon his combination of severe and non-severe impairments. In this case, as Claimant's severe impairments involve the musculoskeletal system or the auditory system, it is appropriate to examine Claimant's impairments in combination under Listing 1.04 (Disorders of the spine) or Listing 2.10 (Hearing loss not treated with a cochlear implant). To satisfy the criteria for Listing 1.04 Claimant must demonstrate that his impairments in combination are medically equal to a disorder of the spine, which results in compromise of a nerve root and shows evidence of nerve root compression, spinal arachnoidistis, or lumbar spinal stenosis. The ALJ

---

[18] The Supreme Court explained the equivalency concept by using Down's syndrome as an example. Down's syndrome is "a congenital disorder usually manifested by mental retardation, skeletal deformity, and cardiovascular and digestive problems." *Id.* At the time of the *Sullivan* decision, Down's syndrome was not an impairment included in the Listing. Accordingly, in order to prove medical equivalency to a listed impairment, a claimant with Down's syndrome had to select the single listing that most resembled his condition and demonstrate fulfillment of the criteria associated with that listing.

[19] SSR 83-19 has been rescinded and replaced with SSR 91-7c, which addresses only medical equivalence in the context of SSI benefits for children. However, the explanation of medical equivalency contained in *Sullivan v. Zembly* remains relevant to this case.

compared Claimant's clinical findings to Listing 1.04 and concluded that his medical findings, signs, and laboratory data did not meet the criteria of the listing specifically because there evidence existed of neurological deficits necessary to meet or equal a Listing under Section 1.04. (Tr. at 12).

The ALJ's conclusion that Claimant did not satisfy Listing 1.04 is supported by substantial evidence. Claimant was treated for back and groin pain over the course of ten years. During the course of his treatment, no physician ever diagnosed Claimant with a neurological disorder of the spine or its equivalent. Claimant was consistently diagnosed as suffering from chronic lumbosacral strain with radicular pain to his groin, but wihtout nerve root compression, arachnoidistis, or stenosis. No physician ever recommended that Claimant have surgery on his back. Moreover, Claimant's other impairments (obesity, hearing loss, peritonsillar abscess, fractured thumb, history of kidney stones, and history of leg burns) do not implicate a neurological disorder that would affect the spine.  Claimant simply cannot satisfy the severity criteria of Listing 1.04.

Similarly, Claimant is unable to meet or equal the criteria of Listing 2.10.  To satisfy the criteria for Listing 2.10 Claimant must demonstrate that his impairments in combination are medically equal to:

    A.    An average air conduction hearing threshold of 90 decibels or greater in the better ear and an average bone conduction hearing threshold of 60 decibels or greater in the better ear; or

    B.    A word recognition score of 40 percent or less in the better ear determined using a standardized list of phonetically balanced monosyllabic words.

The ALJ examined Claimant's clinical findings and concluded that his medical findings, signs, and laboratory data did not meet the criteria of this listing specifically because

there was no evidence of the requisite average air conduction hearing threshold or word recognition score under Listing 2.10.[20] (Tr. at 14).

The ALJ's conclusion is supported by substantial evidence. Charles Abraham, MD, examined Claimant on April 23, 2002 for complaints of hearing loss and tinnitus. (Tr. at 242–43). Claimant reported having difficulty hearing his television and trouble hearing in group situations. (Tr. at 242). Dr. Abraham described the results of an ENT ear exam as "unremarkable" and diagnosed Claimant as suffering from sensorineural hearing loss. (*Id.*). Dr. Abraham concluded that Claimant had suffered .55% (approximately ½ of 1 percent) loss of function for "noise induced hearing loss." (*Id.*). On August 2, 2007, Uma Reddy, MD, a state agency physician, reviewed the medical evidence of record and completed an RFC assessment of Claimant. (Tr. at 529–36). Dr. Reddy assessed the evaluation of Claimant's hearing loss and concluded that he had no significant limitations. (Tr. at 534). No further hearing loss examinations were conducted.  Claimant's other impairments (obesity, chronic back pain, peritonsillar abscess, fractured thumb, history of kidney stones, and history of leg burns) do not implicate a loss of hearing. Therefore, Claimant has failed to present evidence to support a finding that Claimant's average air conduction hearing score exceeded the threshold score or word recognition score and, therefore, Claimant has not satisfied Listing 2.10.

Assuming *arguendo* that Claimant's argument is not that his impairments are medically equivalent to a listed impairment, but that the overall functional consequence of his combined impairments meets the statutory definition of disability, the analysis shifts from the Listing to the ALJ's RFC findings and the remaining steps of the sequential evaluation.  As the Fourth Circuit Court of Appeals stated in *Walker v.*

---

[20] At the time of the administrative hearing, the current Listing 2.10 was found under Listing 2.08.

*Bowen,* "[i]t is axiomatic that disability may result from a number of impairments which, taken separately, might not be disabling, but whose total effect, taken together, is to render claimant unable to engage in substantial gainful activity." 889 F.2d 47, 50 (4th Cir. 1989). The social security regulations provide:

> In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity.

20 C.F.R. § 404.1523. Where there is a combination of impairments, the issue "is not only the existence of the problems, but also the degree of their severity, and whether, together, they impaired the claimant's ability to engage in substantial gainful activity." *Oppenheim v. Finch*, 495 F.2d 396, 398 (4th Cir. 1974). The ailments should not be fractionalized and considered in isolation, but considered in combination to determine the impact on the ability of the claimant to engage in substantial gainful activity. *Reichenbach v. Heckler*, 808 F.2d 309 (4th Cir. 1985).  The cumulative or synergistic effect that the various impairments have on claimant's ability to work must be analyzed. *DeLoatche v. Heckler*, 715 F.2d 148, 150 (4th Cir. 1983).

Here, the ALJ took into account the exertional and non-exertional limitations that resulted from Claimant's medically determinable impairments in determining Claimant's RFC. The ALJ restricted Claimant to sedentary work based upon his musculoskeletal condition, obesity, and loss of hearing.  (Tr. at 12–15). Further, the ALJ found that Claimant could not work in noisy environments and was subject to mild postural and environmental limitations. (*Id.*). The ALJ provided a thorough review of the objective medical evidence, the subjective statements of Claimant, and the opinion

evidence. (*Id*.). Moreover, at the administrative hearing, the ALJ presented the vocational expert with a hypothetical question that required the expert to take into account Claimant's impairments in combination. He asked the expert to assume that Claimant had the exertional limitations identified in his RFC assessment, as well as additional postural and environmental limitations. Despite being asked to assume all of these restrictions, the vocational expert opined that Claimant could perform certain jobs that existed in significant numbers in the economy. (Tr. at 36).

The ALJ's conclusion that Claimant's combination of impairments was not so severe as to preclude Claimant from engaging in substantial gainful activity is amply supported by the medical record. No physician or therapist found that Claimant's impairments separately or in combination prevented him from engaging in substantial gainful activity. Claimant's main treating physicians, Dr. Muniz and Dr. Caraway, consistently encouraged him to look for work and to participate in vocational rehabilitation. In both RFC assessments, the reviewing physicians found that Claimant could engage in "light" to "medium" exertional work with mild postural and environmental limitations. In light of this substantial evidence, the Court is satisfied that the ALJ adequately considered and accounted for the overall functional impact of Claimant's combined impairments.

## C.    **Hypothetical Posed to the Vocational Expert**

Finally, Claimant argues that "[d]ue to the ALJ ignoring or giving very little weight to substantial, objective evidence of record, the ALJ proposed and adopted an hypothetical to the vocational expert which did not wholly and completely address the symptoms and problems suffered by [Claimant]." (Pl. Br. at 15). It is well-established that for a vocational expert's opinion to be relevant, it must be in response to a proper

hypothetical question that sets forth all of the claimant's impairments. *Walker v. Bowen,* 889 F.2d 47, 50–51 (4th Cir. 1989). "[I]t is difficult to see how a vocational expert can be of any assistance if he is not familiar with the particular Claimant's impairments and abilities-presumably, he must study the evidence of record to reach the necessary level of familiarity." *Walker*, 889 F.2d at 51. While questions posed to the vocational expert must fairly set out all of the claimant's impairments, the question need only reflect those impairments supported by the record. *See Chrupcala v. Heckler,* 829 F.2d 1269, 1276 (3rd Cir. 1987). Finally, the hypothetical question may omit non-severe impairments, but must include those that the ALJ finds to be severe. *Benenate v. Schweiker,* 719 F.2d 291, 292 (8th Cir. 1983).

The undersigned finds that the hypothetical, which fully incorporated and paralleled the ALJ's RFC finding, is supported by substantial evidence. The ALJ posed the following hypothetical to the vocational expert:

> I ask you then to hypothetically consider a person who's age is 39 at onset. His education, training and work experience as in the present case. And assuming that I should find that the person suffers from lower back pain, secondary to [inaudible]. The pain goes into his leg. It is aggravated by movement and activity. He apparently also suffers from a hearing loss for which he wears a hearing aide. He can communicate okay. But the hearing loss, he would be precluded from working around very noisy environments. Consistent with the back condition, he probably only occasionally can do postural movements, climbing, balancing, stooping, kneeling, crouching and crawling. He wants to avoid concentrated exposure to extreme cold and to extreme heat, concentrated exposure to vibrations, fumes, odors, dust, gases and poor ventilation, and hazards and should not work at unprotected heights [inaudible]. With [these] restrictions, would there be any work such an individual could perform . . . at the sedentary exertional level?

(Tr. at 36). The hypothetical posed to the vocational expert, and as stated in the RFC finding, described sedentary work with additional postural and environmental restrictions. (Tr. at 12, 36). This hypothetical accurately reflects the medical records.

Furthermore, the hypothetical and RFC finding indicate that although the ALJ discounted Claimant's statements of intensity and persistence of symptoms, the ALJ fairly accommodated Claimant's alleged impairments and complaints to the extent that they were supported by the record. In light of the medical evidence before the Court, the undersigned concludes that the ALJ posed a proper hypothetical to the vocational expert.

## VIII.  <u>Conclusion</u>

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision **IS** supported by substantial evidence. Therefore, by Judgment Order entered this day, the final decision of the Commissioner is **AFFIRMED** and this matter is **DISMISSED** from the docket of this Court.

The Clerk of this Court is directed to transmit copies of this Order to the Plaintiff and counsel of record.

**ENTERED**:  October 20, 2011.

Cheryl A.  Eifert
United States Magistrate Judge